997 F.2d 1394
 84 Ed. Law Rep. 122
 Quintin ELSTON, a/k/a Augustus Elston, a/k/a Cardella
Elston; Rhonda Elston, a/k/a Augustus Elston, a/k/a
Cardella Elston; Tiffanie Elston, a/k/a Augustus Elston,
a/k/a Cardella Elston; Loretta Beavers, a/k/a Dorothy
Beavers; Lecorey Beavers, a/k/a Ronnie Beavers; Delicia
Beavers, a/k/a Dorothy Beavers; Kierston Ball, a/k/a
Gwynethe Ball; Darius Ball, a/k/a Gwynethe Ball; Roslyn
Cochran, a/k/a Johnnie Cochran; Jerrk Evans, a/k/a Kate
Evans; Damien Garrett, a/k/a Althea Garrett; Vernon
Garrett, a/k/a Estella Garrett; Kereyell Glover, a/k/a
Delilah Glover; Stephanie Y. Hill, a/k/a Connally Hill;
Ernest Jackson, a/k/a Rollen Jackson, a/k/a Helen Jackson;
Rayven Jackson, a/k/a Rollen Jackson, a/k/a Helen Jackson;
Carla Jones, a/k/a Willie Jones, a/k/a Bertha Jones;
Danielle Jones, a/k/a Donald Jones; Paul Jones, a/k/a
Willie Jones, a/k/a Bertha Jones; Datrea Morris, a/k/a
Robert Morris; Jeffery Morris, a/k/a Lela Morris; Quintin
Morris, a/k/a Robert Morris; Quinedell Mosley, a/k/a
Quinell Mosley; Quinton Morris, Willie Morris, Tonya
Shepard, a/k/a Mary Alice Jemison; Donyae Swain, a/k/a
Gwendolyn Swain; Kedrick Swain, a/k/a Gwendolyn Swain;
Terry Swain, a/k/a Gwendolyn Swain; Tiffani Swain, a/k/a
Gwendolyn Swain; Cora Tuck, a/k/a Louise Tuck; Jacques
Turner, a/k/a William Tuck, Jr., a/k/a Veronica Tuck;
Wendell Ware, a/k/a John W. Ware; Montina Williams, a/k/a
Angie Williams; Richard Williams, a/k/a Angie Williams,
Plaintiffs-Appellants,
Torrance Beck, a/k/a Albert Beck, Jr., Plaintiff,
v.
TALLADEGA COUNTY BOARD OF EDUCATION; Lance Grissett; Dan
Limbaugh; Watson; Gay Langley; Joseph Pomeroy;
Larry Morris; Beulah Garrett;
Talladega City Board of
Education,
Defendants-
Appellees.
 No. 92-6033.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 13, 1993.
As Amended Aug. 31, 1993.
 
 Cleophus Thomas, Jr., Anniston, AL, Janell M. Byrd, Washington, DC, Julius L. Chambers, Norman J. Chachkin, New York City, for plaintiffs-appellants.
 George C. Douglas, Jr., Gaines, Gaines & Gaines, Talladega, AL, O. Stanley Thornton, Wooten, Thornton, Carpenter, O'Brien & Lazenby, Talladega, AL, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and ANDERSON, Circuit Judges, and HILL, Senior Circuit Judge.
 ANDERSON, Circuit Judge:
 
 
 1
 Plaintiffs-appellants, who represent a class of black children and their parents residing in Talladega County, Alabama, brought this suit against the Talladega County Board of Education, its individual members, and the Talladega County School Superintendent (collectively referred to as "the Board").[1] Plaintiffs challenge several actions the Board took in the course of its recent efforts to restructure its school system. They claim that in taking these actions, the Board violated the Fourteenth Amendment equal protection clause, Title VI of the Civil Rights Act of 1964, the United States Department of Education regulations promulgated pursuant to Title VI, the First Amendment, and Alabama Code § 36-12-40 ("the Alabama Open Records Act"), and committed breach of contract. The district court dismissed plaintiffs' First Amendment, breach of contract, and Alabama Code § 36-12-40 claims; refused to require defendants-appellees to provide discovery regarding any matter prior to the 1985-86 school year; denied plaintiffs' request to supplement the record on remand after a previous appeal; and, after a trial on the claims, decided that plaintiffs had failed to demonstrate any Fourteenth Amendment equal protection clause, Title VI, or Title VI regulations violation. Plaintiffs appeal, arguing that the district court's decisions were erroneous. For the following reasons, we affirm in part, vacate in part, and remand the case to the district court.
 
 I. FACTS
 
 2
 The Talladega County Board of Education has had a long history of involvement in school desegregation litigation. In 1963, black parents residing in Alabama filed Lee v. Macon County Board of Education on behalf of black school children, in an effort to desegregate Alabama's public schools. In 1967, a three-judge district court held that an unconstitutional, segregated school system was being maintained throughout the state. The court ordered state-wide desegregation and directed each school system within the state to adopt a desegregation plan consistent with standards laid out in the court's order.[2] Talladega County submitted a school desegregation plan to the district court and the plan was approved, as supplemented and modified, on February 3, 1970.[3]
 
 
 3
 For over a decade, the Talladega County public schools operated under federal court supervision. On November 7, 1983, however, the Talladega County Board of Education filed a motion requesting that the district court relinquish jurisdiction over the Talladega County schools. See Lee v. Talladega County Board of Education, 963 F.2d 1426, 1428 (11th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993). The Board later amended its motion by filing a resolution, adopted on November 22, 1983, stating that the Board would operate the school system "at all times so as to conform with the United States Constitution, laws passed by Congress, and all previous orders of" the district court. See id.; Plaintiffs' Trial Exhibit 49. On March 13, 1985, federal court supervision of the Talladega County schools came to a close when the district court, pursuant to a Joint Stipulation of Dismissal,[4] declared the Talladega County school system unitary and dismissed the Lee v. Macon County case as applied to Talladega County ("the County").
 
 
 4
 All the actions plaintiffs challenge in this case were taken after the district court declared the Talladega County school system unitary. The actions challenged principally involved four Talladega County Schools: the Talladega County Training High School ("the Training School"),[5] the Jonesview Elementary School, the Idalia Elementary School, and the Hannah Mallory Elementary School. To evaluate the challenged actions, it is important to understand the history of each school; therefore, we provide short descriptions of the schools' racial and grade compositions.
 
 
 5
 The Training School is an historically black school which continued to have a virtually all-black student population up to the time of trial. At the time of trial, the Training School served grades K-12. Jonesview was an historically white grades K-6 school; the proportion of black students at the school increased during the 1980's and in the 1988-89 school year the school was 65% black. Idalia was historically a white grades K-6 school located in a white community. In 1986 the Idalia facility burned down; Idalia's K-4 students thereafter attended school in portable classrooms at the Idalia site, while its grade 5 and grade 6 students were transferred to another middle school. During the 1988-89 school year, Idalia's K-4 student population was 46% black. Hannah Mallory was an historically black grades K-6 school until 1985, when it was closed; its student population was 100% black during that year.
 
 
 6
 On July 22, 1985--shortly after the district court relinquished jurisdiction over the Talladega County schools--the Board adopted a resolution to close the Hannah Mallory Elementary School. Talladega County School Superintendent Lance Grissett thereafter subdivided the Hannah Mallory attendance zone into three parts. One section was assigned to the Jonesview school zone, another section was assigned to the Childersburg school zone, and the third section was assigned to the Training School zone. The majority of Hannah Mallory students were assigned to the Training School, and portable classrooms were needed at the Training School to accommodate the incoming students. The portion of the old Hannah Mallory attendance zone that became a new Training School K-6 zone was not contiguous with the rest of the Training School's K-6 zone, although it was contiguous with an existing Training School 7-12 zone.
 
 
 7
 Two years after the closing of Hannah Mallory, in June 1987, the Board approved the purchase of a site immediately adjacent to the Idalia school for the construction of a new, 500-pupil consolidated elementary school, to be named the Stemley Bridge Road School.[6] According to the Board's plan, grades K-6 at the Training School would be discontinued and the Jonesview school would be closed. Then, areas previously assigned for grades K-6 to the Training School, Jonesview, and Idalia, would be assigned to the new consolidated school. While the Board decided to close grades K-6 at the Training School, it did not plan to close the other Training School grades. Rather, it intended to renovate the Training School for continued use as a grades 7-12 facility. By the time of trial, the Board had stated that it would spend $500,000 on the Training School renovations. Students residing in the former Jonesview K-6 and Training School K-6 zones were to attend the renovated Training School for grades 7-12. As of the time of trial, the Board had not finally decided where it would assign Stemley Bridge Road School graduates who resided in the former Idalia zone. It had decided, however, that many of them would not attend the Training School for junior high and high school, but instead would attend Drew Middle School for grades 7-8 and Lincoln High School for grades 9-12.
 
 
 8
 The closing of Hannah Mallory and the carrying out of the Stemley Bridge Road School construction plans took place in the context of a somewhat unstable student population. The white student population was particularly unstable. In recent years adjacent school districts had made several attempts to annex portions of the Talladega County school district that contained large proportions of white students. In 1982 or 1983 the Oxford City school system had attempted to annex a part of the Talladega County school district, an action that would have removed a large number of white students from a majority-white attendance zone. In 1984, the city of Sylacauga had sought to annex portions of the Talladega County school district that contained a large proportion of white students, and in 1986 the city made a similar attempt.
 
 
 9
 While all three annexation attempts failed, and thus did not actually result in the loss of white students from the County school system, the County system was losing white students through another route: a number of white students, although still residing in the County, were arranging to attend school in neighboring school systems.[7] Most often the white students crossing school system lines resided in majority-black attendance zones such as the Training School's. The district court found, and neither party disputes, that "significant numbers of white students who reside within the Talladega County Training School zone attend public schools in the Talladega City School system." R2-93-10. Plaintiffs produced evidence at trial, and no one disputes, that an average of 68 white students per year attended Jonesview from 1984-85 through 1988-89, while during those years the Training School, to which Jonesview students are assigned for grades 7-12, had an average of only 17 white students per year in grades 7-12.
 
 
 10
 The Board took active steps to prevent the annexation attempts. In response to the Oxford City annexation attempt, the Board filed a motion in the Lee v. Macon County litigation in an effort to stop the annexation. In response to the first Sylacauga annexation attempt, the Board sought the assistance of the Justice Department to stop the annexation, and in response to the second attempt the Board passed a resolution authorizing the Superintendent and the Board's attorney to take all appropriate steps to prevent the annexation. The Superintendent met with the Sylacauga mayor, City Attorney, and City Clerk, and contacted the County's legislative delegation regarding the renewed annexation attempt. Although every student leaving the Talladega County school system, whether by annexation or by interdistrict transfer, cost the school district state and local funds of approximately $3000 per student per school year, the Board did not make a comparable effort to stop the loss of white students through zone-jumping.[8]
 
 
 11
 As the Board was carrying out its school restructuring plans, a group of black parents became concerned about the changes. While the Board did not divulge the specifics of its plans to the general public, these parents had learned from the newspaper that property had been purchased at the Idalia site for the purpose of building a school. The parents also saw in the newspaper a list of bids for the renovation of several schools which did not include the Training School. The parents were troubled because they perceived that the Board was neglecting the Training School and they feared that the Board planned to close the Training School entirely.
 
 
 12
 In early 1988, the black parents made several written attempts to inform the School Superintendent and the Board of their desire to present their concerns at a Board meeting. Superintendent Grissett responded to one letter, and Dr. Morris, the Board president, responded to another, but at least one of the letters was not answered by either the Superintendent or any Board member. Dr. Morris's letter did not disclose the Board's plan to close grades K-6 of the Training School, although the parents' letter had expressed concern that the Training School would be closed, and the plan to close grades K-6 had already been made at the time Dr. Morris wrote his response.
 
 
 13
 Over the course of the year, the parents made a number of unsuccessful attempts to obtain information regarding the Board's school restructuring plans. The group attempted to obtain from the Board a copy of its desegregation plan and subsequent compliance and status reports, but no one responded to their written request. The group wrote to the principals of Idalia, Jonesview, and the Training School requesting student and faculty assignment data, but none of the requested information was provided. In a letter dated May 18, 1988, counsel for the parents contacted the Board's attorney and requested information regarding new construction and school closing plans with respect to the Training School, Jonesview, and Idalia. In his written response of June 23, 1988, the Board's attorney did not inform the parents of the Board's plan, already approved by the state, to close grades K-6 at the Training School. The Board's attorney also stated that the Board had no plans to change the use of the Jonesview School, although the Board at that time had already planned to close the school. Finally, two parents attempted to obtain copies of minutes of the Board's meetings. On May 12, 1988, the Board had passed a resolution prohibiting the recording of its proceedings in any manner by anyone other than the official Board secretary.[9] Subsequently, on June 28, 1988, and again on August 12, 1988, Barbara English and Augustus Elston went to the Board of Education office and requested copies of the official Board minutes. They were not allowed to make copies on either occasion.
 
 II. PROCEDURAL HISTORY
 
 14
 On December 5, 1988, plaintiffs, representing a class of black children and their parents residing in Talladega County, Alabama, brought suit against the Talladega County Board of Education, its individual members, and the Talladega County School Superintendent, claiming that defendants' recent actions violated the Fourteenth Amendment equal protection clause, Title VI of the Civil Rights Act of 1964, the United States Department of Education regulations promulgated pursuant to Title VI, the First Amendment, and Alabama Code § 36-12-40 ("the Alabama Open Records Act"), and that certain of defendants' actions constituted a breach of contract. See R1-1. On the same day, plaintiffs moved for a preliminary injunction to prohibit the Board from beginning construction of the Stemley Bridge Road School on the property adjacent to the Idalia site. See R1-6. On December 12, 1988, defendants moved to dismiss the complaint, and to deny the plaintiffs' motion for a preliminary injunction. See R1-7, 10. On December 29, 1988, the district court dismissed the First Amendment claim, the Alabama Open Records Act claim, and the breach of contract claim. See R1-13. The district court also denied plaintiffs' motion for a preliminary injunction, and ruled that evidence of events occurring before March 13, 1985, the date of the order declaring that the Talladega County school system had attained unitary status, would not be considered.[10] See id.
 
 
 15
 On January 10, 1989, the district court denied the plaintiffs' motion for admission pro hac vice of three attorneys from the NAACP Legal Defense Fund, on the ground that a victory for the plaintiffs might result in an undue burden on Talladega County taxpayers. See R1-20. On January 30, 1989, the district court allowed the pro hac vice admission of one attorney. See R1-30. On May 26, 1989, plaintiffs moved to add the Talladega City Board of Education ("the City Board") as a defendant. See R1-62. On June 1, 1989, the district court denied the motion on the ground that it was filed after the court's May 5, 1989 deadline for adding parties. See R1-63.
 
 
 16
 After a trial held on August 21, 22, and 23, 1989, on the Fourteenth Amendment and Title VI claims, the district court determined that defendants had not acted with discriminatory intent, that their actions did not have a discriminatory effect on blacks, and that defendants had offered legitimate, non-discriminatory reasons for their actions. The district court therefore concluded that plaintiffs had failed to demonstrate any violation of the Fourteenth Amendment, Title VI, or the Title VI regulations, and thus denied them relief on any of these claims. See R2-93.
 
 
 17
 Plaintiffs appealed the district court's denial of relief, and on April 30, 1991, this court per curiam vacated the judgment of the district court, holding that it had abused its discretion in denying pro hac vice admission of two of the NAACP Legal Defense Fund attorneys and in denying plaintiffs' motion to add the Talladega City Board of Education as a party defendant, 933 F.2d 1020. See R2-106. We remanded with directions that the district court grant the motion for leave to add the City Board as a party, grant the motion for admission pro hac vice of the two attorneys, permit any additional discovery that was necessary, and conduct any additional evidentiary hearings determined to be appropriate. See id.
 
 
 18
 On remand, the district court admitted plaintiffs' two additional attorneys and added the Talladega City Board of Education as a party defendant. See R2-111. The district court limited the consideration of additional evidence to that which the plaintiffs could prove only because of the presence of the City Board in the lawsuit or only because of the assistance of the two additional NAACP Legal Defense Fund attorneys. See R2-114. The district court refused to reconsider its initial decisions to dismiss the breach of contract, First Amendment, and Alabama Open Records Act claims, or its limitation on discovery regarding events occurring prior to the 1985-86 school year. See R2-117. The court also ruled that it would not receive evidence of events occurring after the close of the evidence in the August 1989 trial. See id. The district court scheduled a supplementary hearing on January 16, 1992, so that plaintiffs might offer any evidence not precluded by the court's limitations. See id.
 
 
 19
 Stating that they had no additional evidence to offer in the categories or time frame prescribed by the district court, the plaintiffs moved to cancel the supplementary hearing. See R2-126. On January 7, 1992, the district court granted that motion. See R2-127. It then adopted the Findings of Fact and Conclusions of Law it had entered on September 19, 1989, following the August 1989 trial, and entered final judgment in favor of the defendants. See id.; R2-128. Plaintiffs now appeal, arguing that the district court erred in deciding that they had failed to demonstrate any Fourteenth Amendment, Title VI, or Title VI regulations violation; in dismissing their breach of contract, First Amendment, and Alabama Open Records Act claims; in refusing to require defendants to provide discovery regarding any matter prior to the 1985-86 school year; and in denying their request to supplement the record on remand after the first appeal.
 
 III. STANDARDS OF REVIEW
 
 20
 We review the district court's findings of fact for clear error. Fed.R.Civ.P. 52(a); Newell v. Prudential Ins. Co. of America, 904 F.2d 644, 649 (11th Cir.1990) (citations omitted). A finding is clearly erroneous when " 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We review the district court's legal conclusions de novo. Newell, 904 F.2d at 649 (citations omitted). More specifically, we review the district court's findings as to whether the Board engaged in intentional discrimination for clear error, see Pullman-Standard v. Swint, 456 U.S. 273, 286, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982), and we review the district court's fact findings relevant to the Title VI regulations disparate impact inquiry for clear error. However, we review de novo the legal significance attributed to these findings by the district court. We also review de novo the dismissals of the breach of contract claim and the First Amendment claim for failure to state a claim.
 
 
 21
 We review the district court's refusal to exercise pendent jurisdiction over the Alabama Open Records Act claim for abuse of discretion. See Phillips v. Smalley Maintenance Services, Inc., 711 F.2d 1524, 1531 (11th Cir.1983). We also review for abuse of discretion the district court's orders denying plaintiffs' request to supplement the record on remand and refusing to require defendants to comply with discovery requests regarding events occurring prior to the 1985-86 school year.
 
 IV. DISCUSSION
 A. FOURTEENTH AMENDMENT AND TITLE VI CLAIMS
 
 22
 On appeal, plaintiffs argue that the district court erred in determining that not one of four challenged Board actions violated either the Fourteenth Amendment equal protection clause or the Title VI implementing regulations.[11] First, they challenge as error the district court's failure to deem discriminatory the closing of Training School grades K-6 and the siting of the Stemley Bridge Road School adjacent to Idalia instead of at the Training School. Second, they claim that the district court should have deemed discriminatory the Board's failure to channel all Stemley Bridge Road School graduates to the Training School for grades 7-12. Third, they contend that the district court should have declared discriminatory defendants' failure to prevent white school children residing in the Training School 7-12 zone from transferring out of the Talladega County school system and into the Talladega City system. Finally, they challenge as error the district court's failure to declare discriminatory the Board's assigning the majority of the Hannah Mallory children to the Training School via a non-contiguous attendance zone.
 
 1. Legal Standards
 
 23
 The Fourteenth Amendment equal protection clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To establish an equal protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate. See, e.g., Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); Washington v. Davis, 429 U.S. 229, 239-48, 96 S.Ct. 2040, 2047-52, 48 L.Ed.2d 597 (1976). Discriminatory intent may be established by evidence of such factors as substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements in the legislative or administrative history of the decision. Arlington Heights, 429 U.S. at 265-69, 97 S.Ct. at 563-65. Discriminatory intent may be found "even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials." Williams v. City of Dothan, Ala., 745 F.2d 1406, 1414 (11th Cir.1984).
 
 
 24
 Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. While Title VI itself, like the Fourteenth Amendment, bars only intentional discrimination, the regulations promulgated pursuant to Title VI may validly proscribe actions having a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory. See Guardians Ass'n v. Civil Service Comm'n of New York City, 463 U.S. 582, 584 n. 2, 103 S.Ct. 3221, 3223 n. 2, 77 L.Ed.2d 866 (1983); Alexander v. Choate, 469 U.S. 287, 292-94, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985); Georgia State Conference of Branches of NAACP v. State of Georgia, 775 F.2d 1403, 1417 (11th Cir.1985). The United States Department of Education ("the Department of Education") has promulgated regulations pursuant to Title VI that prohibit recipients of its funds from taking certain actions to the extent that those actions have a disparate impact on groups protected by the statute. The Board receives some of its funding from the Department of Education, and is therefore subject not only to the duty of nondiscrimination mandated by Title VI, but also to the duties of nondiscrimination mandated by the Department of Education regulations promulgated pursuant to Title VI. Since the district court evaluated the challenged Board actions under the Title VI disparate impact analysis, as well as the Fourteenth Amendment equal protection analysis, and since the Board did not object to the district court's choice of legal standards, we assume arguendo that the actions challenged by plaintiffs fell within the scope of those Department of Education Title VI regulations that incorporate a disparate impact standard, and thus we assume arguendo that it was proper to apply the disparate impact analysis in this case.[12]
 
 
 25
 To establish liability under the Title VI regulations disparate impact scheme, a plaintiff must first demonstrate by a preponderance of the evidence that a facially neutral practice has a disproportionate adverse effect on a group protected by Title VI.[13] Georgia State Conference, 775 F.2d at 1417. If the plaintiff makes such a prima facie showing, the defendant then must prove that there exists a substantial legitimate justification for the challenged practice in order to avoid liability. Id.[14] If the defendant carries this rebuttal burden, the plaintiff will still prevail if able to show that there exists a comparably effective alternative practice which would result in less disproportionality, or that the defendant's proffered justification is a pretext for discrimination. Id.
 
 
 26
 The plaintiff's duty to show that a practice has a disproportionate effect by definition requires the plaintiff to demonstrate a causal link between the defendant's challenged practice and the disparate impact identified. Thus, the plaintiff cannot make out a prima facie disparate impact claim if the evidence tends to show that even had the defendant not engaged in the challenged practice, the same disparate impact would nonetheless have existed. Cf. United States v. Lowndes County Board of Education, 878 F.2d 1301, 1305 (11th Cir.1989) ("racial imbalance in the public schools amounts to a constitutional violation only if it results from some form of state action and not from factors, such as residential housing patterns, which are beyond the control of state officials."); Freeman v. Pitts, --- U.S. ----, ----, 112 S.Ct. 1430, 1447, 118 L.Ed.2d 108 (1992) (same).2. Evaluation of District Court's Application of Fourteenth Amendment Equal Protection Clause and Title VI Regulations Standards to Challenged Board Actions
 
 
 27
 Having laid out the legal standards applicable to plaintiffs' equal protection and Title VI regulations claims, we now address plaintiffs' contention that the district court erred in determining that not one of four challenged Board actions violated either the equal protection clause or the Title VI regulations.
 
 
 28
 a. Siting of the New Consolidated School
 
 
 29
 Plaintiffs challenge the Board's decision to place the new consolidated elementary school at the site adjacent to Idalia. They claim that the Board could just as easily have consolidated the Jonesview, Idalia, and Training School elementary grades at the Training School, either by adding on to existing space at the Training School or by constructing entirely new elementary facilities. According to plaintiffs, the Board's decision to place the new school at the Idalia site instead of at the Training School site not only had an unjustifiable disparate impact on black students in violation of the Title VI regulations, but also was the product of discriminatory animus in violation of the equal protection clause. The district court determined that "[t]he plaintiffs have not shown that the location of the new Stemley Bridge Road School was racially motivated or effected a disparate impact on blacks," R2-93-15, and therefore decided in defendants' favor on both the equal protection and the Title VI regulations siting claims. See R2-93-21-22.
 
 
 30
 i. Challenge Under Equal Protection Clause
 
 
 31
 Plaintiffs argue that the district court clearly erred in determining that the Board's decision to locate the new consolidated elementary school adjacent to Idalia did not violate the equal protection clause, because according to plaintiffs the Board's decision to place the new school next to Idalia was motivated by discriminatory intent. They point to several factors which they claim demonstrate that discriminatory animus drove the Board's siting decision.[15] First, they claim that placing the new school next to Idalia instead of at the Training School site rendered the Training School underutilized, and revealed the Board's discriminatory purpose, since absent racial considerations one would not expect the Board knowingly to underutilize a school. Second, plaintiffs claim that the Board erected barriers to their participation in the school restructuring decisionmaking process, such as by failing to answer some of their letters, by refusing to provide them with certain requested information, and by providing them with some misleading information. This failure to involve plaintiffs in the decisionmaking process is further evidence that the school siting was motivated by discriminatory animus, they contend. Third, plaintiffs argue that expanding the Training School to accommodate the consolidated elementary school would have been cheaper than building a new school adjacent to Idalia. The Board's choice of the costlier course of action could only be explained as a product of racial considerations, they claim. Finally, plaintiffs argue that Talladega County has a history of closing or downgrading historically black schools, and that this history bolsters their claim that racial concerns drove the Board's siting decision.
 
 
 32
 After carefully considering the entire record, we conclude that the district court did not clearly err in finding that the Board's siting decision was not motivated by discriminatory intent. The district court found that adequate land for expansion was not readily available at the Training School site, that the Board needed all the existing space at the Training School to upgrade the school for grades 7-12, and that the Board did not wish to locate the new elementary school at the site of a middle school or high school. See R2-93-17-18. The latter two findings are supported by the record and are not clearly erroneous. See R4-310-11 (Testimony of Talladega County School Superintendent Lance Grissett regarding use of elementary space at Training School for grades 7-12 renovations);[16] R4-318, 337 (Testimony of Superintendent Grissett regarding Board's reluctance to mix grades K-6 and grades 7-12 children). As for the first finding, there was some evidence that members of the Dumas family and members of the Lawson family, who owned land adjacent to the Training School, may have been willing to negotiate the sale of some land. On the other hand, there was also evidence that the Lawson family was generally reluctant to sell their land, and that they may not have been willing to sell the amount of land required for the new school. See R3-194, 196-98, 200-201, 203 (Testimony of Lawson family representative Fred Lawson). Furthermore, it is not clear from the evidence that the Board could readily have acquired from the Dumas family the required amount of land. See R4-477-78 (Testimony of Dumas family representative Lawrence Dumas, Jr.). Thus, we cannot say that the district court clearly erred in finding that adequate land for expansion was not readily available at the Training School site.[17] Given that adequate land for expansion was not readily available, that the Board needed all the existing space at the Training School for the grades 7-12 renovations, and that the Board did not wish to place grades K-6 and grades 7-12 children together, it is just as plausible that the Board's failure to place the new school at the Training School site was the product of these three considerations as that the Board's decision was the product of racial animus.[18] Therefore, we cannot conclude that the district court clearly erred in finding that the Board's siting decision was based on these logistical and educational considerations rather than on any discriminatory considerations. See R2-93-15.
 
 
 33
 As for plaintiffs' proffered evidence of discrimination, the district court did not clearly err in rejecting it as unpersuasive. The district court apparently determined plaintiffs' allegations of "planned underutilization" of the Training School to be unfounded, since it found that the Board actually hoped to attract more students to the Training School by renovating it. See R2-93-18. Neither finding is clearly erroneous. Moreover, the district court found that defendants planned significant renovations at the Training School, including the addition of computer labs, science labs, and greatly expanded home economics and industrial arts facilities. See id. In this context, the district court could reasonably have concluded that plaintiffs' evidence of a high square foot/student ratio reflected not a discriminatory desire to segregate black students, but rather a desire to reserve adequate space for the installation of up-to-date facilities. Thus, we cannot conclude that the district court clearly erred in failing to find that plaintiffs' underutilization evidence demonstrated that the Board's siting decision was motivated by discriminatory intent.
 
 
 34
 As for plaintiffs' claim that the Board erected barriers to their participation in the process of school restructuring, we agree with the district court's finding that there was no evidence that the Board sought opinions from parents of students who would be affected by the consolidation of Jonesview, Idalia, and grades K-6 of the Training School. See R2-93-8. We also agree with the district court's finding that the Board had delayed in providing the public generally with information regarding developments under consideration. See R2-93-19. The district court also properly recognized that through its attorney's June 23, 1988 letter, the Board provided the black parents' group with misleading information regarding its plans. See R2-93-10.
 
 
 35
 However, the district court ultimately found no evidence that the Board's failure to be forthcoming with information regarding its plans was motivated by racially discriminatory animus; rather, the district court found that the Board was reluctant to share information with black parents and white parents alike. See R2-93-8, 19. The district court did not clearly err in making this finding. Of course, common sense indicates that ordinarily, public servants will readily receive and even solicit input from their constituents; the failure to do so may in some instances give rise to reasonable inferences of ulterior motive. Likewise, school board consultations with black parents may be evidence of a lack of discriminatory intent. See, e.g., Lee v. Anniston City School System, 737 F.2d 952, 957 (11th Cir.1984). However, we cannot conclude on this record that the district court clearly erred in finding that the Board's treatment of plaintiffs was not motivated by racially discriminatory animus. Thus, the district court did not clearly err in rejecting the evidence as demonstrating intent to discriminate in siting the new school.
 
 
 36
 With respect to plaintiffs' cost argument, the district court found that the expense of constructing new elementary facilities for about 550 Idalia, Jonesview, and Training School elementary students would have been approximately the same whether the school was located next to Idalia or at the Training School site. See R2-93-4. In so finding, it appears that the district court implicitly rejected plaintiffs' contention that the Board could have relied in part on existing space at the Training School to accommodate the 550 students, and implicitly found instead that placing the new school at the Training School site would have required constructing entirely new elementary facilities, as was necessary at the Idalia site. Thus, it appears that the district court implicitly rejected plaintiffs' argument that by placing the new school at the Training School site instead of at the Idalia site the Board could have saved money by not having to build entirely new elementary facilities. We cannot conclude that these findings are clearly erroneous. As already discussed, the Board needed to use the existing elementary space at the Training School for the grades 7-12 renovations; thus, that space could not have been used for the new consolidated elementary school. In this context, it was not clearly erroneous for the district court to find that the Board would have had to pay the cost of constructing entirely new facilities even if the new school had been placed at the Training School site.[19]
 
 
 37
 Plaintiffs appear to argue that, even if the Board needed all the existing space at the Training School for the grades 7-12 renovations, placing the new school at the Training School site would still have been substantially cheaper than placing it at the Idalia site, for two reasons. First, they claim, if the new grades K-6 school had been placed at the Training School site, the elementary children could have shared certain facilities with the grades 7-12 children, so that the Board could have saved money by not having had to construct those facilities in duplicate for the grades K-6 children. Second, they claim, even if entirely new facilities would have had to be built for the grades K-6 children, the Board could have saved money by arranging for the grades K-6 and grades 7-12 schools to share certain services and personnel. The district court did not explicitly address these arguments. However, in our view, it was not clear from the testimony of plaintiffs' expert that these measures could have been taken or that significant savings could have been obtained in this way. See, e.g., R4-438-41 (Testimony of plaintiffs' expert Thomas Richard Mason). Furthermore, even if building the new school at the Training School site would have been somewhat cheaper than placing it at the Idalia site, due to the greater potential for consolidating facilities, services, and personnel at the Training School site, the Board's inability readily to acquire at the Training School site the amount of land needed for expansion made it infeasible for the Board to place the new school at the Training School site. In the context of all the evidence, we cannot conclude that the district court clearly erred in rejecting plaintiffs' cost evidence as demonstrating that the siting decision was motivated by discriminatory intent.
 
 
 38
 Finally, the district court did not discuss plaintiffs' evidence regarding the Board's history of closing or downgrading historically black schools. We assume that the district court did consider the evidence, and that its silence indicates its rejection of the evidence as demonstrating discriminatory animus.[20] While such evidence could potentially be probative of discriminatory intent, we do not believe that the district court clearly erred in rejecting the historical data as demonstrating discriminatory intent in this particular case. After careful consideration of the totality of the circumstances revealed by the record, we cannot conclude that the district court clearly erred in finding that no discriminatory intent motivated the Board's siting decision. Since a plaintiff must demonstrate discriminatory intent to recover under the equal protection clause, see supra Part IV.A.1., and since these plaintiffs have not done so with respect to the Board's siting decision, we affirm the district court's judgment for defendants on the siting equal protection claim.
 
 
 39
 ii. Challenge Under Title VI Regulations
 
 
 40
 Plaintiffs also argue that the district court erred in determining that the Board's siting decision did not have a disparate impact on blacks and thus that plaintiffs had failed even to make a prima facie showing that the siting decision violated the Title VI regulations. See R2-93-15, 22; see supra Part IV.A.1. They contend that siting the new school next to Idalia, in a white community, had a disparate impact on blacks in at least three ways. First, it denied blacks the benefit of having the new school in their community while granting that benefit to whites. Second, it stigmatized black children by sending them a message that their community was not worthy of hosting a school that whites would attend. Finally, the Board's siting choice left the Training School "small and at constant risk of closure, impairing its ability to offer a full curriculum to its students." Plaintiffs' Reply Brief on Appeal at 9.
 
 
 41
 Each of the effects identified by plaintiffs might well constitute a disparate impact, and we assume arguendo that plaintiffs have demonstrated disparate impact. However, we need not decide this question because we conclude that the Board has demonstrated a substantial legitimate justification for its siting decision. Under the Title VI disparate impact scheme, once plaintiffs have demonstrated a disparate impact, defendants bear the burden of demonstrating that their challenged practice is supported by a "substantial legitimate justification." Georgia State Conference, 775 F.2d at 1417. Most Title VI disparate impact cases in the educational context have involved challenges to the classification of students by ability through the use of standardized tests and other methods. See, e.g., Georgia State Conference of Branches of NAACP v. State of Georgia, 775 F.2d 1403 (11th Cir.1985) (challenge to use of achievement grouping in Georgia public schools); Larry P. By Lucille P. v. Riles, 793 F.2d 969 (9th Cir.1984) (challenge to use of certain IQ tests to assign children to classes for educable mentally retarded); cf. Sharif by Salahuddin v. New York State Educ. Dept., 709 F.Supp. 345 (S.D.N.Y.1989) (Title IX disparate impact challenge to use of Scholastic Aptitude Test to allocate state merit scholarships; court borrows Title VI disparate impact standards). In these cases, defendants attempting to meet the "substantial legitimate justification" burden have commonly been required to demonstrate the "educational necessity" of their practices, that is, to show that their challenged practices "bear a manifest demonstrable relationship to classroom education." Georgia State Conference, 775 F.2d at 1418; see also Larry P., 793 F.2d at 982 & n. 9 (defendant must demonstrate that "the requirement which caused the disproportionate impact was required by educational necessity," i.e. that "any given requirement has a manifest relationship to the education in question"); cf. Sharif, 709 F.Supp. at 361 (quoting Georgia State Conference ); Groves v. Alabama State Board of Education, 776 F.Supp. 1518, 1530-32 (M.D.Ala.1991) (in post-Wards Cove, pre-Civil Rights Act of 1991 Title VI disparate impact education case, defendants required to produce evidence that challenged practice significantly justified by legitimate educational rationale); Board of Education v. Harris, 444 U.S. 130, 151, 100 S.Ct. 363, 375, 62 L.Ed.2d 275 (1979) (defendant may rebut showing of disparate impact in Emergency School Aid Act case by proving "educational necessity" of challenged practice). The Title VI regulations education cases tend not to explain explicitly what it means to show that a challenged practice has a "manifest relationship to classroom education." However, from consulting the way in which these cases analyze the "educational necessity" issue, it becomes clear that what the cases are essentially requiring is that defendants show that the challenged course of action is demonstrably necessary to meeting an important educational goal. Such necessity is considered a substantial legitimate justification for the challenged practice. See, e.g., Georgia State Conference, 775 F.2d at 1417-18; cf. Sharif, 709 F.Supp. at 361.
 
 
 42
 Although the defendants in this case are responsible for the administration of educational institutions, the decision challenged in the instant claim--the Board's decision to place the new school adjacent to Idalia rather than at the Training School site--is more accurately characterized as an infrastructure planning decision, rather than as an educational policy decision such as the decision to use testing to group students by ability. Since infrastructure planning decisions are not educational in a narrow sense, it seems inappropriate to ask defendants to show that their siting decision was necessary to meeting an educational goal in a narrow sense. It is more reasonable in a case like this to ask that defendants meet the more abstract requirement which underlies the context-specific "educational necessity" requirement and which applies in Title VI disparate impact cases generally: showing that the challenged decision was necessary to meeting a goal that was legitimate, important, and integral to the defendant's institutional mission. Thus, in our view defendants can show a substantial legitimate justification for their siting decision if they can show that the decision was necessary to meeting a legitimate, important goal integral to their mission of administering educational institutions--i.e. that their decision was necessary to meeting an educational goal in a broader sense.
 
 
 43
 We believe that defendants have met the requirement of showing that the challenged siting decision was necessary to meeting such a goal. Defendants claim that they could not place the new consolidated school at the Training School site because adequate land for expansion was not available adjacent to the Training School. Defendants adduced evidence in support of their claim that adequate land for expansion was not available at the Training School site, and the district court made a finding to that effect, a finding we have already deemed not clearly erroneous. Since adequate land on which to place the new consolidated elementary school facilities was not available at the Training School site, the Board is obviously correct that it was not feasible to place the new school at the Training School site, and that it was therefore necessary to place the new school elsewhere in order to achieve the goal of building the school. We think it clear that the goal of building the new consolidated school was legitimate, important, and integral to the Board's educational mission. Thus, defendants have shown that because of the lack of adequate land for expansion at the Training School site, placing the new school somewhere besides at the Training School site was necessary to achieving a legitimate, important goal integral to the Board's educational mission: the goal of building the school. Since defendants have demonstrated the necessity of their school siting decision, they have demonstrated a substantial legitimate justification for that decision.[21] Even if we assume arguendo that plaintiffs have made a prima facie case of disparate impact, defendants have met their rebuttal burden, placing the onus on plaintiffs either to proffer a comparably effective alternative practice which would result in less racial disproportionality, or to show that defendants' justification was pretextual. See supra Part IV. A. 1.
 
 
 44
 Because plaintiffs are unable to meet their ultimate burden, they cannot prevail on their Title VI siting challenge. Regarding the pretext issue, we have already concluded in the course of our equal protection analysis that the district court did not clearly err in finding that the lack of adequate land for expansion at the Training School site and the consequent necessity of placing the new school elsewhere (along with other legitimate considerations), rather than discriminatory animus, drove the Board's siting decision. Thus, plaintiffs cannot show that this justification was pretextual. As for the possibility of a less discriminatory alternative, since the district court properly found that the land the Board needed for expansion simply was unavailable at the Training School site, obviously plaintiffs cannot demonstrate that placing the new school at that site would have been comparably as effective as placing it at the Idalia site. Since plaintiffs have proffered no other alternative sites, they have not met their ultimate burden of proof; thus, the district court properly decided in defendants' favor on the Title VI regulations challenge to the siting of the new school.
 
 
 45
 b. The Board's Failure to Make Coextensive the Stemley Bridge Road School and Training School Grades 7-12 Attendance Zones
 
 
 46
 Once they realized they could not stop the construction of the new consolidated school at the Idalia site, plaintiffs urged the Board to send all students graduating from the new school to the Training School for grades 7-12.[22] While the Board planned to continue sending all former Jonesview and Training School K-6 students to the Training School for grades 7-12, the Board did not agree to send all students living in the former Idalia zone to the Training School for junior high and high school. According to plaintiffs, the Board's failure to send Idalia-zone students to the Training School not only had an unjustifiable disparate impact on black students in violation of the Title VI regulations, but also was the product of discriminatory animus in violation of the equal protection clause. The district court found that assigning all the Stemley Bridge Road students to the Training School for grades 7-12 "would add about 135 white students to the Training School which would significantly improve integration at the Training School." R2-93-3. The district court also found, however, that the anticipated attendance zones for Stemley Bridge Road students for grades 7-12 were consistent with the operation of a unitary, racially nondiscriminatory public school system. R2-93-14. This conclusion implied a finding that plaintiffs had failed to prove that the Board's attendance zone decision was motivated by discriminatory intent. It was obviously because of this finding that the district court decided in defendants' favor on the attendance zone equal protection claim. See R2-93-21-22. Although the district court never specifically decided that plaintiffs had failed to prove disparate impact with respect to the attendance zone decision, it did conclude overall that "plaintiffs have failed to establish by a preponderance of the evidence that any of the challenged decisions and practices violated the regulations or otherwise had a disparate impact on blacks." R2-93-22. This conclusion implicitly incorporated a determination that plaintiffs had failed to prove that the Board's attendance zone decision had a disparate impact on blacks.
 
 
 47
 i. Challenge Under Equal Protection Clause
 
 
 48
 Plaintiffs argue that the district court clearly erred in failing to find that the Board's choice of attendance zones was racially motivated. They cite two factors as evidence of the Board's discriminatory intent. First, they point to Superintendent Grissett's conflicting trial testimony regarding the attendance zones, and his alleged failure following trial to recommend the attendance zones he testified he would recommend. Second, they point to the underutilization of the Training School which they say would result from the Board's chosen attendance zones.
 
 
 49
 We do not believe that the district court clearly erred in rejecting plaintiffs' equal protection clause challenge to the Board's choice of attendance zones. It is true that Superintendent Grissett's trial testimony regarding attendance zones was somewhat inconsistent. At one point, he testified that he intended to abide by a pretrial affidavit, in which he had stated that "feeder patterns" for the Training School would not change--in other words, that grades 7-12 at the Training School would continue to be fed by students from the former Jonesview and Training School K-6 zones, and that students in the former Idalia zone would continue to attend Lincoln High School. See R4-268; R1-33-2. Later, when asked to draw the dividing line between students he expected to attend Lincoln and those he expected to attend the Training School, Superintendent Grissett drew a line which bisected the former Idalia zone, indicating that some students from that zone would be assigned to the Training School for grades 7-12. See R4-301-302; Defendants' Exhibit 30. It is unclear why Superintendent Grissett testified inconsistently; however, we do not think that the district court clearly erred in rejecting the inconsistency as evidence of discriminatory intent.
 
 
 50
 Plaintiffs also point to evidence that after trial, Superintendent Grissett did not recommend that any students from the former Idalia zone be assigned to the Training School for grades 7-12, despite the fact that the diagram he drew at trial indicated that he would recommend that some Idalia-zone students attend the Training School after they finished the sixth grade. Plaintiffs apparently argue that the discrepancy between Superintendent Grissett's ultimate recommendation and the diagram he drew at trial demonstrated discriminatory intent. The district court rejected plaintiffs' request to supplement the record with post-trial evidence, including evidence of Superintendent Grissett's post-trial attendance zone recommendation. See R2-125; R2-127. As discussed below, this was not an abuse of discretion. See infra Part IV. D. 3. Even if we considered the evidence of Superintendent Grissett's post-trial recommendation, we would not find that it proved discriminatory animus; in light of Superintendent Grissett's testimony that feeder patterns to the Training School would probably remain the same, see R4-268, and that the Board had not finally decided what feeder patterns it intended to implement, see R3-207, it is not at all clear that his post-trial actions were inconsistent with his trial testimony.
 
 
 51
 As for plaintiffs' argument that the alleged planned underutilization of the Training School could not be explained by anything other than discriminatory animus, we have already decided that the district court did not clearly err in rejecting the contention that the Board intended to underutilize the Training School, as well as in rejecting the contention that the high square foot/student ratio reflected a desire to segregate white and black students. See supra Part IV. A. 2. a. Under all the circumstances, we cannot conclude that the district court clearly erred in finding no racial motivation in defendants' decision to leave in place the pre-existing feeder patterns. Since a plaintiff must demonstrate discriminatory intent to recover under the equal protection clause, see supra Part IV. A. 1., and since these plaintiffs have not done so with respect to the Board's feeder patterns decision, we affirm the district court's judgment for defendants on the feeder patterns equal protection claim.
 
 
 52
 ii. Challenge Under Title VI Regulations
 
 
 53
 Plaintiffs also contend that the district court erred in deciding that they had failed to prove that the Board's choice of attendance zones had a disparate impact on black students, and thus that they had not even made a prima facie showing that the Board's attendance zone decision violated the Title VI regulations. See R2-93-22; see supra Part IV. A. 1. Plaintiffs argue that the Board's failure to send students from the former Idalia zone to the Training School for grades 7-12 produced a disparate impact on black students both because it increased the racial identifiability of the Training School and because it left the school underutilized and likely to be closed.
 
 
 54
 Certainly an increase in the racial identifiability of the Training School would constitute a disparate impact, and we assume arguendo that an increase in underutilization would also constitute a disparate impact. However, to succeed on their claim, plaintiffs had to show not only that a disparate impact existed, but also that the impact was causally linked to a Board policy or decision. See supra Part IV. A. 1. The district court clearly was not persuaded that the Board's attendance zone decision had any significant effect on the school's racial identifiability and level of utilization. The district court found as a fact that many white children zoned to attend the Training School for grades 7-12 never attended, and instead went to Talladega City or Sylacauga City schools. See R2-93-10, 11, 16. This finding is not clearly erroneous, particularly since no one disputes that the Training School was virtually all-black at all relevant times, even though some white students lived within its attendance zone.[23] As mentioned above, the district court did find that assigning the children from the former Idalia zone to the Training School for grades 7-12 would have significantly improved integration at the Training School. However, in light of its determinations that many white children failed to attend the Training School and that the Board's attendance zone decision had not produced a disparate impact on black students, it is clear that the district court meant, not that white students from Idalia would have attended the Training School if assigned there, but only that if they had attended, integration would have improved. In fact, the district court's explicit determinations indicate that it implicitly found that plaintiffs did not and could not prove that white Idalia-zone students, if zoned for the Training School for grades 7-12, actually would have attended. In other words, we believe that the district court implicitly found that the Board's failing to send the Idalia-zone children to the Training School had no significant effect on the school's racial identifiability and level of utilization, because the district court did not believe plaintiffs had proven that white Idalia-zone students, if assigned to the Training School, would have attended that school rather than city schools or private schools. Thus, we believe that the district court rejected plaintiffs' contention that the Board's attendance zone decision produced a disparate impact because it found that plaintiffs had not demonstrated a causal link between any disparate impact and the Board's attendance zone decision. We cannot conclude that the district court's causation finding is clearly erroneous. Since a plaintiff must demonstrate a causal link between a challenged practice and the disparate impact identified to make a prima facie case under the Title VI regulations, see supra Part IV. A. 1., and since these plaintiffs have not demonstrated a causal link between the Board's feeder patterns decision and any increased racial identifiability or underutilization at the Training School, the district court properly ruled in the defendants' favor on plaintiffs' Title VI regulations challenge to the Board's choice of attendance zones.[24]
 
 
 55
 c. The Board's Failure to Stop "Zone-Jumping" By White Students
 
 
 56
 Plaintiffs contend that many of the white children residing in Talladega County who are assigned to the Training School do not attend that school, and instead attend school out-of-district, in Talladega City. Plaintiffs contend that the Board has done nothing to stop such zone-jumping, and that the Board's inaction has violated both the equal protection clause and the Title VI regulations. The district court denied plaintiffs relief on both the equal protection and the Title VI regulations interdistrict transfer claims. See R2-93-21-22; R2-127.
 
 
 57
 Plaintiffs argue that the district court erred in failing to grant them relief on these claims. According to plaintiffs, the district court decided that the Board's interdistrict transfer policy violated both the equal protection clause and the Title VI regulations, but denied plaintiffs relief only because the Board, as a practical matter, could not prevent zone-jumping. See Plaintiffs' Brief on Appeal at 49. In plaintiffs' view, the district court believed that the Talladega City Board had prevented the Talladega County Board from stopping zone-jumping. See id. Plaintiffs point out that the Talladega City Board was added as a party on remand following the first appeal in this case. See R2-111. Once the district court had added the party that it believed had prevented the Talladega County Board from stopping zone-jumping, plaintiffs contend, there was no reason for the district court to have denied plaintiffs relief on the zone-jumping claims on remand. See Plaintiffs' Brief on Appeal at 49.
 
 
 58
 We believe that plaintiffs' view of the district court's opinion is inaccurate. The district court apparently denied plaintiffs relief on the interdistrict transfer claims because it concluded that the Talladega County Board's zone-jumping policy did not violate either the equal protection clause or the Title VI regulations. See R2-93-21-22. We conclude that the district court did not err in so ruling.
 
 
 59
 i. Challenge Under Equal Protection Clause
 
 
 60
 According to plaintiffs, the Board's failure to stop white students zoned for the Training School from transferring into Talladega City schools has been motivated by discriminatory animus and thus has violated the equal protection clause. Plaintiffs contend that three factors reveal the Board's discriminatory intent. First, they point to the Board's November 22, 1983 resolution stating that the Board would operate the Talladega County school system at all times so as to conform with the district court's orders in the Lee v. Macon County litigation. Part of the court-ordered desegregation plan in Lee v. Macon County provided that if the Board granted transfers to students living in its district for attendance at public schools outside the district, it had to do so on a non-discriminatory basis, and provided that the Board could not consent to transfers where the cumulative effect would reinforce the dual school system in either the transferor or the transferee system. Plaintiffs' Trial Exhibit 49.[25] Plaintiffs contend that the Board has in fact consented to the transfers of white students zoned for the Training School into Talladega City schools, and that the Board's action has had the effect of increasing the duality of the County system. The Board's failure to follow through on its resolution to comply with the district-court-ordered transfer provision is "strong evidence of discriminatory intent," plaintiffs claim. Plaintiffs' Brief on Appeal at 48.
 
 
 61
 Second, plaintiffs claim, while the Board has failed to respond to the transfer of white students from the majority-black Training School, it has actively sought to prevent the loss of white students from majority-white schools. According to plaintiffs, the Board "has done nothing to stop" white students zoned for the Training School from zone-jumping to Talladega City schools. Plaintiffs' Reply Brief on Appeal at 19. In contrast, plaintiffs point out, on three occasions the Board took strong action against the loss of white students from majority-white schools: (1) the Board filed a motion in the Lee v. Macon County litigation in an effort to stop the early 1980's Oxford City annexation attempt; (2) the Board sought the assistance of the Justice Department to stop the city of Sylacauga's 1984 annexation attempt; and (3) in response to Sylacauga's second annexation attempt in 1986, the Board passed a resolution authorizing the Superintendent and the Board's attorney to take all appropriate action to prevent the annexation, and the Superintendent met with the Sylacauga Mayor, City Attorney, and City Clerk, and contacted the County's legislative delegation regarding the annexation attempt. According to plaintiffs, this pattern of selective Board action has been governed by the Board's discriminatory reluctance to make white students attend majority-black schools.[26]
 
 
 62
 Finally, plaintiffs contend, that the County school district has been losing approximately $3000 for each interdistrict transfer underscores the fact that discriminatory motives have governed the Board's policy towards zone-jumping. Had the Board not wished to permit white students to "escape" the Training School, plaintiffs suggest, it would have taken more pains to retain school funds.
 
 
 63
 The district court found that significant numbers of white students residing in the Training School attendance zone attended public schools in the Talladega City school system, see R2-93-10, that many of these white students were probably avoiding the Training School, see R2-93-11, and that the Board had taken "few, if any, steps to stop the loss of white students" from the Training School to Talladega City and Sylacauga City schools, R2-93-12. These findings are supported by the record and are not clearly erroneous. The district court also found, however, that the Board "in no way intend[ed] to discriminate against plaintiffs on the basis of race or to deny plaintiffs equal protection by not being more 'creative' in finding a way to prevent" the zone-jumping, R2-93-20, and therefore decided that plaintiffs had failed to demonstrate that the Board's zone-jumping policy violated the equal protection clause. See R2-93-21-22.
 
 
 64
 After reviewing the entire record, we cannot say that the district court clearly erred in finding that no discriminatory animus motivated the Board's interdistrict transfer policy. Regarding the Board's compliance with the transfer provision, we agree with plaintiffs that the transfer of white students from the Training School to Talladega City schools has had the effect of increasing the duality of the County school system. As we stated when interpreting a similar transfer provision in United States v. Lowndes County Board of Education, 878 F.2d 1301 (11th Cir.1989), transfers are deemed to increase the duality of a school system when they increase the racial identifiability of the schools in the system. Lowndes County, 878 F.2d at 1305. The effect of the transfers is to be measured on a school-by-school basis; the duality of the system as a whole is deemed to have increased when even one school experiences increased racial identifiability. Id. Thus, defendants are simply incorrect in asserting that, because the overall racial balances at Talladega County and Talladega City schools have not changed over the past twenty years, any zone-jumping could not have increased the duality of Talladega County schools. If the Board consented to transfers and those transfers increased racial identifiability solely at the Training School, the Board's actions would still have been inconsistent with the transfer provision.
 
 
 65
 Certainly the outflow of white students from the Training School zone may be said to have increased the racial identifiability of the Training School. Defendants do not contest plaintiffs' contention that fifty-four white students transferred out of district from the Training School zone in the 1988-89 school year, in contrast to only five black students. We agree with the district court's finding that many of those transferring were attempting to "avoid" the virtually all-black Training School, which they presumably perceived as a "black school." Had those white students attended the Training School, their presence would surely have reduced the perception of the Training School as a "black school"; conversely, their "avoiding" the Training School could only reinforce such perceptions.
 
 
 66
 However, although the zone-jumping of white students has increased the duality of the Talladega County school system, the transfer provision only forbids transfers exacerbating racial identifiability to the extent that the Board "consent[s]" to the transfers. We do not believe that the Board may be said to have consented to transfers which, as we discuss in the next section, it was powerless to prevent. Thus, we do not believe that the Board may be said to have violated the transfer provision with which it agreed to comply, and we cannot say that the district court clearly erred in rejecting this evidence as demonstrating discriminatory intent.
 
 
 67
 We are more troubled by the evidence that the Board has made a greater effort to keep white students from leaving majority-white attendance zones than it has made to keep white students from leaving majority-black attendance zones. Defendants do not dispute that in the past they have taken active measures to prevent Oxford City and Sylacauga City from annexing portions of the County school district containing large proportions of white students, nor that they have not been as active in combatting zone-jumping by white students zoned for the Training School. This disparity could support an inference that the Board's actions have been governed by a discriminatory desire to ensure that white students do not have to attend majority-black schools.
 
 
 68
 We cannot conclude, however, that the district court clearly erred in failing to determine that this disparity demonstrated discriminatory intent. Several district court findings support the ultimate finding that the Board did not intend to discriminate against blacks in dealing with zone-jumping. First, the district court found that the Board does not condone zone-jumping, and that the Board clearly would like to halt it. See R2-93-15, 20. We cannot deem these findings clearly erroneous, as they have some support in the record; for example, Superintendent Grissett testified that the County's policy was not to allow interdistrict transfers. See R4-319-21. Second, the district court found that the Board had few, if any avenues to stop zone-jumping other than discouraging it by making improvements to the school system. See R2-93-20. As we explain in the next section, we cannot deem this finding clearly erroneous. See infra Part IV. A. 2. c. ii. Even if this were not true in fact, there is evidence that the Board did not believe there was much it could do to stop zone-jumping besides improving its system. Both the Talladega City and the Sylacauga City school superintendents testified that they knew of no way the Board could prevent a County student from attending either city's school if either city would accept the student, see R3-132-33 (Testimony of Talladega City School Superintendent Billy Mills); R5-541 (Testimony of Sylacauga City School Superintendent Joseph Morton), and Talladega County School Superintendent Grissett testified that he was not aware of any procedure for preventing another public system from accepting for enrollment a Talladega County child. See R4-324. Finally, the district court implicitly found that the Board had made at least some effort to stop zone-jumping, in making the explicit finding that one motivation for upgrading the Training School was the desire to discourage zone-jumping. See R2-93-18, 21. These findings are not clearly erroneous, as Superintendent Grissett did testify that the Training School renovations were intended in part to attract students who previously had been avoiding the school. See R4-314.
 
 
 69
 We cannot say that this record clearly indicates that the Board was intentionally failing to prevent zone-jumping because of a racist reluctance to make white students attend a majority-black school. Given that the Board disapproved of zone-jumping and wished to stop the practice, that the Board believed there was little it could do to stop zone-jumping besides improving its system, and that the Board was in fact upgrading the Training School partly in an effort to discourage zone-jumping, the district court could reasonably have concluded that the Board's failure to take stronger measures against zone-jumping was the product of its belief that such measures would be fruitless, rather than the product of racial animus.[27] Thus, we cannot hold that the district court clearly erred in finding that the Board's zone-jumping policy was not motivated by discriminatory intent. Since a plaintiff must demonstrate discriminatory intent to recover under the equal protection clause, see supra Part IV. A. 1., and since these plaintiffs have not done so with respect to the Board's zone-jumping policy, we affirm the district court's judgment for the Board on the zone-jumping equal protection claim.
 
 
 70
 ii. Challenge Under Title VI Regulations
 
 
 71
 According to plaintiffs, the Board's failure to prevent zone-jumping has not only violated the equal protection clause, but also has imposed an unjustifiable disparate impact on black students in violation of the Title VI regulations, by causing an increase in the racial identifiability of the Training School.
 
 
 72
 The district court, however, apparently concluded that the Board's zone-jumping policy did not have a disparate impact on black students and therefore did not violate the Title VI regulations, for it stated that "plaintiffs have failed to establish by a preponderance of the evidence that any of the challenged decisions and practices violated the regulations or otherwise had a disparate impact on blacks." R2-93-22. It seems that the district court drew this conclusion from two of its antecedent factual findings. First, it found that any zone-jumping did "not appear to have changed significantly over the years the racial composition of the students in the Talladega County system or the Talladega City system." R2-93-20. Second, the district court found that the Board could not as a practical matter prevent the zone-jumping. See R2-93-16 ("Talladega County school personnel are, as a practical matter, unable to prevent this [zone-jumping], since the enrollment and attendance of a public school student is verified and determined by the gaining school system (i.e., the city school system) and not by the losing school system (in this case, Talladega County)."); R2-93-20 ("the Talladega County Board has few, if any avenues available to it to stop this drain from its system other than to discourage it by improvements to its system, such as the improvements out of which this suit arose.").
 
 
 73
 It appears from the first finding noted above that the district court accepted defendants' contention that zone-jumping could cause no disparate impact where it did not produce a change in the overall racial compositions of the transferor and transferee school districts. The district court erred in accepting this contention, for the lack of variation in overall racial composition does not end the Title VI regulations inquiry. As discussed above, the inquiry into whether transfers increase the duality of a school district is to be made on a school-by-school basis; an increase in the racial identifiability of one school is enough to increase the duality of that school's district as a whole in the way prohibited by court-ordered transfer provisions like Talladega County's.[28] Likewise, we believe that an increase in the racial identifiability of the Training School would be enough to constitute a disparate impact under the Title VI regulations, regardless of whether overall racial balances have changed in either the Talladega County or the Talladega City school systems. Cf. Price v. Austin Independent School District, 729 F.Supp. 533, 550 (W.D.Tex.1990), aff'd, 945 F.2d 1307 (5th Cir.1991) ("The increase in number of racially identifiable schools under the 1987 plan ... amounts to evidence of disparate impact"); Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (where one component of multi-step promotion process produced disparate impact on black employees, fact that process overall did not result in underrepresentation of blacks in ultimately promoted class did not preclude Title VII violation). As discussed above, we believe that the zone-jumping of white students has increased the racial identifiability of the Training School, see supra Part IV. A. 2. c. i.; thus zone-jumping may be said to have produced a disparate impact on black students in Talladega County.
 
 
 74
 However, the existence of a disparate impact also does not resolve the Title VI regulations inquiry. As discussed with respect to attendance zones, in addition to showing disparate impact, plaintiffs also had to demonstrate that the disparate impact was causally linked to a challenged Board policy. See supra Part IV.A.1. If zone-jumping and the increase in racial identifiability it produced would have occurred no matter what the Board did, the Board's policy towards zone-jumping could not be said to have caused the identified disparate impact and plaintiffs could not prevail under the Title VI regulations.
 
 
 75
 Plaintiffs contend that the Board could have taken several actions that would have reduced the zone-jumping problem. They claim that the Board could have stopped zone-jumping by refusing to transfer the records of students whom the Board determined to be attending school out of zone.[29] See R3-103 (Testimony of lead plaintiff and Talladega County parent Augustus Elston), 119 (Testimony of Talladega County parent and teacher Shirley Jones). They suggest that the Board could have discouraged zone-jumping by notifying the parents of students suspected to be attending out of zone. See Plaintiffs' Brief on Appeal at 29. Plaintiffs also suggest, relying on the fact that neither Talladega City nor Sylacauga City was released from the Lee v. Macon County litigation until July 1988, that until that date the Board could have stopped zone-jumping to Talladega City by requesting that Talladega City comply with the transfer provision in its court order, a provision which was virtually identical to Talladega County's.[30] See Plaintiffs' Brief on Appeal at 29-30; R1-83-10. Even after Talladega City was released from the Lee v. Macon County litigation, plaintiffs contend, the Board could have reduced the incidence of zone-jumping by contacting Talladega City school officials and requesting that they voluntarily take action to stop interdistrict transfers by County students. See Plaintiffs' Brief on Appeal at 30. There is no dispute that the Board has taken none of these measures. See, e.g., R1-83-10; R2-93-11.
 
 
 76
 In finding that the Board was unable to prevent zone-jumping as a practical matter, the district court implicitly found that zone-jumping would have occurred no matter what actions were taken by the Board. In other words, the district court found that plaintiffs had not established that the Board's policy regarding zone-jumping was causally linked to the disparate impact identified. We cannot conclude that this finding is clearly erroneous. First of all, there was evidence that the Board could not have relied on the withholding of student records to combat zone-jumping; two witnesses testified that county superintendents could not legally withhold student records for any reason when the records were properly requested, see R3-133 (Testimony of Talladega City School Superintendent Billy Mills); R4-325 (Testimony of Talladega County School Superintendent Lance Grissett), although it is also true that we could not find a state law governing the transfer of student records, and that there is some question whether records requested by a student attempting to attend out-of-district are "properly requested."[31] Second, there was evidence that notifying parents of out-of-zone students would not have been an effective way to combat zone-jumping. At least two witnesses testified that parents have been willing to falsify address information and arrange legal guardianships for their children to get their children into desired out-of-zone schools. See R3-121-22 (Testimony of Talladega County parent and teacher Shirley Jones); R5-509-16 (Testimony of Sylacauga City teacher Rochelle Kidd). This evidence suggests that many parents have been so anxious to remove their children from County schools that a mere warning from County school officials would be insufficient to stop them from sending their children out of zone. As for the contentions that the Board should have requested that Talladega City comply with its court-ordered transfer provision, and that after July 1988 the Board should have asked the City voluntarily to combat zone-jumping, plaintiffs produced no persuasive evidence that making such requests to the City Board would have reduced the zone-jumping problem. When asked by plaintiffs' attorney whether the City would have "taken some effort to control the influx of students from the county system" if asked to do so by the County, Talladega City School Superintendent Billy Mills testified, "I can't answer that because it would depend on the time request and what was involved as to the action we would have taken." R3-143. Although Superintendent Mills testified that "[w]e [the City] would have cooperated with them [the County]" if the County had asked the City for assistance in preventing zone-jumping, R3-143, Superintendent Mills never stated that the City would actually have taken any action to combat zone-jumping by County students.[32] We cannot conclude from the evidence before us that the district court clearly erred in finding that the Board was unable to prevent zone-jumping, and thus cannot conclude that the district court clearly erred in finding that plaintiffs had failed to prove that the Board's policy towards zone-jumping was causally related to any disparate impact. Since a plaintiff must demonstrate a causal link between a challenged practice and the disparate impact identified to make a prima facie case under the Title VI regulations, see supra Part IV.A.1., and since these plaintiffs have not demonstrated a causal link between the Board's zone-jumping policy and the increase in racial identifiability at the Training School, the district court properly ruled in the Board's favor on plaintiffs' Title VI regulations challenge to the Board's zone-jumping policy.[33]
 
 
 77
 The district court's conclusion that the Talladega County Board had not violated either the equal protection clause or the Title VI regulations, a conclusion we have just held proper, explains why it denied plaintiffs relief on their zone-jumping claims even after the Talladega City Board was added as a party, see R2-127. Given that the Talladega County Board did not violate either the equal protection clause or the Title VI regulations, the addition of the City Board as a party would have entitled plaintiffs to relief only under one of two sets of circumstances. First, plaintiffs would have been entitled to relief if they had proven that the City Board itself had violated the equal protection clause or the Title VI regulations. Second, even if plaintiffs could not have shown that the City Board itself had committed such violations, they would still have been entitled to relief if they had proven that the City Board and the County Board had violated the Title VI regulations through cooperative action. Proof of cooperation would have justified holding both municipal units liable for their combined actions, even if the actions of neither municipal unit alone had violated the Title VI regulations.[34] Yet plaintiffs never raised at trial (nor did they raise on appeal) the contention that the City Board itself had violated either the equal protection clause or the Title VI regulations. See R1-62. Nor did they raise at trial the argument that the City Board and the County Board had cooperated to violate the Title VI regulations.[35] Plaintiffs' only argument at trial regarding the City Board was that, to the extent the County Board was liable for violating either the equal protection clause or the Title VI regulations, joinder of the City Board as a party defendant was necessary to an effective remedy against the County Board. See id. However, the district court's determination that the County Board was not liable for violating either the equal protection clause or the Title VI regulations, a conclusion we have just held proper, rendered moot the issue of the proper remedy for any violation and thus irrelevant the presence of the City Board as a party. Therefore, the district court's refusal to grant plaintiffs relief on their interdistrict transfer claims even after the City Board was added as a party was proper.
 
 
 78
 d. The Reassignment of Students Following the Closing of the Hannah Mallory Elementary School
 
 
 79
 According to plaintiffs, the manner in which the Board reassigned students upon the closing of the all-black Hannah Mallory Elementary School--i.e. the Board's sending most Hannah Mallory students to the Training School via a non-contiguous attendance zone--violated both the equal protection clause and the Title VI regulations. The district court did not make any explicit determinations on either claim. However, it did decide that plaintiffs had failed to establish that any of the challenged Board decisions were "tainted by a racially discriminatory animus," R2-93-21-22, and that plaintiffs had failed to establish that any of the challenged decisions had a disparate impact on blacks, see R2-93-22. Thus, it obviously decided that the challenged student reassignment plan violated neither the equal protection clause nor the Title VI regulations.
 
 
 80
 Plaintiffs argue that the district court erred in failing to decide that the challenged plan violated either the equal protection clause or the Title VI regulations. They support their equal protection claim by pointing to several factors which they say reveal the discriminatory animus underlying the Board's reassignment decisions. First, they refer to the provision in the County's court-ordered desegregation plan from Lee v. Macon County stating that "[a]ll school construction, school consolidation, and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented." Plaintiffs' Trial Exhibit 49. They assert that in reassigning Hannah Mallory students the Board failed to honor its commitment to comply with this provision, and that this failure is evidence of discriminatory purpose. Second, plaintiffs argue, the fact that the Board had to create a non-contiguous attendance zone to assign Hannah Mallory students to the Training School strongly suggests that racial considerations governed the Board's reassignment plan. Finally, that assigning most of the Hannah Mallory students to the Training School caused overcrowding is strong evidence of discriminatory motives, plaintiffs assert, since absent an intent to segregate black children at the Training School one would not expect the Board to overtax a single school.
 
 
 81
 Plaintiffs support their Title VI regulations claim by citing evidence that the Board's reassignment plan had a disparate impact on black students at the Training School. They point out that assigning the bulk of Hannah Mallory students to the Training School increased the concentration of blacks at the school, thereby furthering segregation and hindering the desegregation process. They also point out that the assignment of Hannah Mallory students to the Training School burdened the students there in that it caused overcrowding and required the use of portable classrooms.
 
 
 82
 Since this litigation was filed, the Stemley Bridge Road School has been built and is being attended by students from the former Idalia, Jonesview, and Training School elementary attendance zones. Thus, any black students who would have been affected by the overcrowding and concentration of black students at the Training School following the closing of Hannah Mallory are now attending the substantially more integrated Stemley Bridge Road School.[36] In acknowledgement of these changed circumstances, the only relief plaintiffs now request is an injunction regarding 1) the feeder patterns for the Training School and 2) zone-jumping. Thus, their challenge to the reassignment of Hannah Mallory students is now moot, except to the extent that the Board's reassignment actions may be evidence of its intent to discriminate in making some other decision. Because plaintiffs' challenge is moot, we will not consider it. However, we have considered the Board's reassignment actions as part of the overall evidence of the Board's intent to discriminate in making other challenged decisions.[37]
 
 B. BREACH OF CONTRACT CLAIM
 
 83
 Relying on the fact that the Joint Stipulation of Dismissal in Lee v. Macon County incorporated the Board resolution stating that the Board would continue to comply with the court orders in Lee v. Macon County, see supra Part I, plaintiffs argue that an agreement to comply with the Lee v. Macon County orders is implicit in the Joint Stipulation of Dismissal. Since defendants have failed to comply with the Lee v. Macon County orders, plaintiffs contend, defendants are liable for breach of the agreement. The district court dismissed the breach of contract claim for failure to state a claim because it concluded that "where court orders or agreements implicit in court orders are a basis for relief, that basis should be pursued in" the litigation where those orders were entered, i.e. in Lee v. Macon County. R1-13-2.
 
 
 84
 Plaintiffs contend that we should reverse the district court's dismissal of their breach of contract claim. However, we are bound by our ruling in Lee v. Talladega County Board of Education, 963 F.2d 1426 (11th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993), to affirm the district court's dismissal of the claim. Before filing the present action, plaintiffs had attempted to obtain relief on virtually the same claims by moving to reopen the Lee v. Macon County litigation. The Lee v. Macon County district court denied plaintiffs' motion to reopen the case, holding that they could obtain the relief they sought only by filing a new lawsuit. On appeal, we affirmed the denial of the motion to reopen. In affirming, we held that the "stipulation of dismissal [was] not a contract between the parties," and that the "incorporation of the [Board's] resolution did not create an enforceable contract," it being "plain that [the resolution] did not create any obligation enforceable against the [Board]." Lee v. Talladega County Board of Education, 963 F.2d at 1431-32. Having held that the Board's resolution to comply with the Lee v. Macon County orders did not create any enforceable obligation, we cannot now subject the Board to contract liability for any failure to comply with those orders. The district court thus properly dismissed plaintiffs' breach of contract claim for failure to state a claim.C. FIRST AMENDMENT CLAIM
 
 
 85
 Plaintiffs contend that the Board's May 12, 1988 resolution prohibiting the recording "in any manner" of its public meetings violates the First Amendment. They argue that the resolution impinges on the ability of black citizens who attend school board meetings to communicate to others their impressions of what takes place at those meetings. Thus, they claim, the resolution burdens their exercise of the rights of free speech and free association, and of the right to petition for redress of grievances.
 
 
 86
 The district court granted defendants' motion to dismiss the First Amendment claim for failure to state a claim without stating its reasons for doing so. See R1-13-2. Plaintiffs contend that we should reverse the district court's ruling as erroneous. We decline to review the dismissal in the absence of a statement of rationale, however. We therefore vacate the dismissal of the First Amendment claim and remand for a statement of reasons for the dismissal.
 
 D. OTHER ISSUES ON APPEAL
 1. Pendent Jurisdiction
 
 87
 In its December 29, 1988 order, the district court declined to exercise pendent jurisdiction over plaintiffs' claim under Ala.Code § 36-12-40, the Alabama Open Records Act. See R1-13-2-3. Plaintiffs argue that this ruling constituted an abuse of discretion. However, we hold that the district court did not abuse its discretion in declining to exercise pendent jurisdiction over the claim.
 
 
 88
 2. Evidence Regarding Events Occurring Before 1985-86 School Year
 
 
 89
 In its December 29, 1988 order, the district court stated that the only evidence it would consider regarding the Fourteenth Amendment equal protection and Title VI claims would be that concerning events occurring since March 13, 1985, the date that Talladega County was dismissed from the Lee v. Macon County litigation. See R1-13-3. The district court consequently refused to require defendants to provide discovery regarding any matters occurring prior to the 1985-86 school year. See R1-49-2. Plaintiffs wished the district court to consider evidence regarding school closings and restructurings that had occurred before March 13, 1985; they claim that the district court's rulings constituted an abuse of discretion because facts regarding past school closings or restructurings could be evidence that present Board actions were discriminatorily motivated.
 
 
 90
 We agree with plaintiffs that actions taken by the Board prior to the 1985-86 school year could be evidence that later Board actions were discriminatorily motivated. However, it appears to us that the district court actually did consider school closings and restructurings occurring prior to March 13, 1985, for it accepted both testimony and exhibits regarding those matters. See, e.g., R3-41-44 (Testimony of lead plaintiff and Talladega County parent Augustus Elston); Defendants' Exhibit 4; Plaintiffs' Trial Exhibit 49; see also supra Part IV. A. 2. a. i. Under these circumstances, we find no error in the district court's rulings regarding pre-1985-86 evidence.
 
 3. Evidence Regarding Post-Trial Events
 
 91
 On remand following the first appeal to this court, plaintiffs sought to supplement the record with evidence regarding the Board's final choice of attendance zones for the Stemley Bridge Road School and the Training School and regarding interdistrict transfers. See R2-123. All the proffered evidence involved events occurring after the August 1989 trial. The district court refused to consider any evidence of events occurring subsequent to the close of the evidence at trial on August 23, 1989, including the evidence contained in plaintiffs' offer of proof on remand, on the ground that such an expansion of the lawsuit was not warranted. See R2-117; R2-125; R2-127. According to plaintiffs, this refusal constituted an abuse of discretion.
 
 
 92
 We hold that the district court did not abuse its discretion in refusing to supplement the record on remand with evidence of post-trial events. Of course, our holding is no bar to a future suit based on actions taken or conditions arising since trial.[38]
 
 V. CONCLUSION
 
 93
 For the foregoing reasons, we affirm the district court's judgment for defendants on the Fourteenth Amendment, Title VI, and Title VI regulations claims. We also affirm the district court's dismissal of the breach of contract claim and of the Alabama Open Records Act claim, and we affirm the district court's rulings regarding the receipt of evidence of events occurring before March 13, 1985, or after August 23, 1989. However, we vacate the district court's dismissal of plaintiffs' First Amendment claim and remand the case with instructions.
 
 
 94
 AFFIRMED in part, VACATED in part, and REMANDED.
 
 
 
 [1]
 The Talladega City Board of Education was later added as a defendant
 
 
 [2]
 See Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.) (three-judge court), aff'd sub nom, Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967)
 
 
 [3]
 See Lee v. Macon County Board of Education (Talladega County), No. 604-E (M.D.Ala. Feb. 3, 1970)
 
 
 [4]
 The Joint Stipulation of Dismissal incorporated the Board's November 22, 1983 resolution. See Plaintiffs' Trial Exhibit 49; Lee v. Talladega County Board of Education, 963 F.2d at 1428
 
 
 [5]
 Since trial, the Talladega County Training High School has been renamed "Central High School." We will adopt the plaintiffs' and defendants' practice of referring to the school by its former name for the purposes of this action
 
 
 [6]
 As the Board further developed the Stemley Bridge Road School plans, it decided to construct the school large enough to accommodate 550 students
 
 
 [7]
 The parties refer to the practice of transferring into a school outside one's attendance zone as "zone-jumping." We will adopt this term for the purposes of this opinion. We will also use the term "interdistrict transfer" to refer to the practice
 
 
 [8]
 On remand after a previous appeal in this case, plaintiffs proffered evidence indicating that zone-jumping was continuing to occur up through the end of 1991, see R2-123, and we assume that zone-jumping continues to occur at present. On remand plaintiffs also proffered evidence that in 1991, Talladega City attempted to annex several majority-white sections of Talladega County that were located in heavily black Talladega County attendance zones, for the purpose of allowing the white students from those sections legally to attend Talladega City schools. See id. According to plaintiffs, the Board had not taken any action to stop this annexation attempt by the time they proffered the evidence. See id
 The district court refused to consider plaintiffs' offer of proof on remand because the evidence proffered involved events occurring after August 23, 1989, the last day of trial, and it did not believe that an expansion of the lawsuit was warranted. See R2-117; R2-125; R2-127. As discussed below, we do not believe that the district court abused its discretion in so ruling. See infra Part IV. D. 3. Thus, for the purposes of this appeal, we are only evaluating Board actions regarding zone-jumping that were taken on or before August 23, 1989, the last day of trial. However, our holdings here are no bar to a future suit challenging Board actions regarding zone-jumping that were taken since trial.
 
 
 [9]
 The following is the text of the resolution:
 Be it resolved, that the recording of the proceedings conducted by the Talladega County Board of Education by anyone, in any manner, other than the official secretary of the Board is hereby prohibited and anyone violating this resolution shall be escorted from the meeting and denied further access to meetings of the Board.
 See R1-83-7-8.
 
 
 [10]
 The district court refused to require the defendants to provide any discovery regarding matters occurring before the 1985-86 school year in an April 24, 1989 order. See R1-49-2
 
 
 [11]
 Technically speaking, plaintiffs challenge defendants' actions under Title VI itself as well as under the equal protection clause and the Title VI regulations. Since Title VI itself provides no more protection than the equal protection clause--both provisions bar only intentional discrimination, see Alexander v. Choate, 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985)--we will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis. Our equal protection discussion should be understood as disposing of plaintiffs' Title VI statutory claims as well
 
 
 [12]
 Relevant Department of Education Title VI regulations include 34 C.F.R. §§ 100.3(b)(2) and 100.3(b)(3). Section 100.3(b)(2) provides that
 [a] recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.
 Section 100.3(b)(3) provides that
 [i]n determining the site or location of a facilit[y], an applicant or recipient may not make selections with the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any programs to which this regulation applies, on the ground of race, color, or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act or this regulation.
 See also Georgia State Conference, 775 F.2d at 1417 & n. 18.
 
 
 [13]
 In this case, the protected group at issue was blacks. Thus, in order to make a prima facie showing that a given Board action violated the Title VI regulations, plaintiffs had to show that the action had a disparate impact on blacks
 
 
 [14]
 In deciding Title VI disparate impact claims we borrow from standards formulated in Title VII disparate impact cases. Indeed, the Title VI disparate impact scheme laid out in Georgia State Conference was derived from Title VII standards. See Georgia State Conference, 775 F.2d at 1417. In Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125-26, 104 L.Ed.2d 733 (1989), the Supreme Court altered the Title VII disparate impact scheme by shifting the burden of persuasion on the second, justification prong from the defendant to the plaintiff. In the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071 (codified at 42 U.S.C. §§ 2000e-2000e-16) [hereinafter "the Civil Rights Act of 1991"], Congress responded to this aspect of Wards Cove by returning the burden of persuasion with respect to justification to the defendant
 Throughout the trial of this case, the parties and the district court operated on the assumption that the scheme articulated in Georgia State Conference applied. Neither party has questioned this assumption on appeal. Because we conclude that plaintiffs are not entitled to relief even under the more relaxed standard under which they litigated, we need not decide whether Wards Cove required the reallocation of the burden of persuasion on justification in Title VI disparate impact cases litigated after Wards Cove was decided but before the Civil Rights Act of 1991 became law.
 
 
 [15]
 With respect to each decision they challenge under the equal protection clause, plaintiffs have highlighted those factors they believe most clearly indicate discriminatory motivation. Of course, several of the identified factors are potentially probative of discriminatory intent with respect to all the challenged decisions. Furthermore, each challenged decision is potentially probative of discriminatory intent with respect to the other decisions. For the sake of clarity, our equal protection clause analysis of each decision focuses on the factors plaintiffs have specifically emphasized. However, we have considered all the relevant evidence of discrimination with respect to each decision. For example, although we conclude below that plaintiffs' challenge to the reassignment of students upon the closing of the Hannah Mallory School is moot, we have considered the circumstances surrounding the closing of that school as part of the overall evidence of intent to discriminate in making the other challenged decisions
 
 
 [16]
 It is not at all clear from the testimony of plaintiffs' expert, Thomas Richard Mason, that the Board could have carried out its grades 7-12 renovation plans without using the existing elementary building at the Training School, so that that building could have been used as part of the new consolidated school. See R-4-419 (Testimony of plaintiffs' expert Thomas Richard Mason)
 
 
 [17]
 As plaintiffs point out, the district court did find that "[t]here is property adjacent to the Talladega County Training School which if acquired by gift, purchase or condemnation, would have been suitable for expansion." R2-93-7. However, plaintiffs are mistaken in their assertion that this finding contradicts the finding that adequate land was not readily available at the Training School site. See Plaintiffs' Brief on Appeal at 19. The finding quoted above does not suggest that property adjacent to the Training School was readily available, but only that if such property could have been obtained, it would have been suitable for expansion
 We note that both parties and the district court appeared to assume that, if the new school had been placed at the Training School site, regardless of whether entirely new facilities would have been needed or whether some of the existing space at the Training School could have been used for the new school, the Board would have had to acquire a fairly substantial amount of land adjacent to the Training School in order to accommodate the consolidated elementary students. In other words, everyone seemed to take as a given that, whatever new facilities would have been needed, those facilities could not simply have been placed on existing Training School land (i.e. land the Board already owned). We assume that this is true, since the parties and the district court did so.
 
 
 [18]
 We note that, given the assumption that the Board would have had to acquire a fairly substantial amount of land adjacent to the Training School in order to accommodate the consolidated elementary students, the Board's inability readily to acquire the requisite amount of land next to the Training School presumably precluded placing the new school at the Training School site
 
 
 [19]
 As mentioned above, it is not at all clear from the testimony of plaintiffs' expert, Thomas Richard Mason, that other buildings besides the elementary building at the Training School could have been used for the grades 7-12 renovations, so that the Board could have saved money by using the elementary building as part of the new consolidated school. See R-4-419 (Testimony of plaintiffs' expert Thomas Richard Mason)
 
 
 [20]
 In their proposed factual findings, plaintiffs had listed ten paragraphs containing facts regarding school closings and downgradings which they stated they would offer to the court by proffer. Plaintiffs did not actually proffer the evidence at trial, apparently because the evidence had already been introduced through certain testimony and exhibits. In its Findings of Fact and Conclusions of Law, the district court noted that plaintiffs had not made the proffer and stated that "that section of the [proposed fact findings document containing the ten paragraphs] will not be addressed by the court." R2-93-13. Plaintiffs have apparently construed this statement as a refusal to consider any evidence regarding school closings and downgradings. See Plaintiffs' Brief on Appeal at 13. Given that the district court did admit the evidence through other channels, however, we believe that the district court did consider the evidence. See infra Part IV.D.2. The district court's statement that it would not "address" the ten paragraphs was presumably meant to clarify that it would not specifically comment on facts which were not proffered at trial. Likewise, we assume that the district court's silence about the evidence simply means that the court was not persuaded by it
 
 
 [21]
 Defendants have proffered two other reasons for their decision not to place the new school at the Training School site: their need to use the existing space at the Training School for the renovated grades 7-12 school, and their desire to separate elementary and grades 7-12 children. Since we hold that defendants have demonstrated a substantial legitimate justification for their siting decision--the necessity of placing the new school at a site other than the Training School site due to the lack of adequate land for expansion adjacent to the Training School--we need not reach the issue of whether either of the other proffered reasons made the Board's siting decision necessary to achieving an important goal
 
 
 [22]
 The Board could do this by making the Stemley Bridge Road School K-6 attendance zone coextensive with the Training School 7-12 attendance zone
 
 
 [23]
 Plaintiffs themselves produced evidence that very few white Jonesview students actually attended the Training School for grades 7-12, though they were assigned to go there. As previously indicated, plaintiffs point out that for school years 1984-85 through 1988-89 there were 68 white students per year at Jonesview on average, while during those years the Training School had an average of only 17 white students per year in grades 7-12
 
 
 [24]
 Since plaintiffs have not made a prima facie showing that the Board's feeder patterns decision violated the Title VI regulations, the Board is entitled to prevail without having to demonstrate any substantial legitimate justification for its decision. See supra Part IV. A. 1. Thus, we need not address the Board's several justification arguments
 
 
 [25]
 We do not understand the district court's finding that plaintiffs have failed to establish that this transfer provision was included in the court orders with which the Board agreed to comply in its November 22, 1983 Resolution. See R2-93-11. This finding is clearly erroneous
 
 
 [26]
 As discussed above, plaintiffs also point to evidence, which they proffered to the district court on remand, that in 1991 Talladega City attempted to annex several majority-white sections of Talladega County that were located in heavily black Talladega County attendance zones, for the purpose of allowing the white students from those sections legally to attend Talladega City schools. See R2-123. According to plaintiffs, the Board had not taken any action to stop this annexation attempt by the time they proffered the evidence. See id. The Board's inaction in the face of this annexation attempt also demonstrates the Board's discriminatory reluctance to make white students attend majority-black schools, plaintiffs suggest. See Plaintiffs' Brief on Appeal at 31
 The district court on remand refused to consider evidence regarding post-trial events, including this annexation evidence, and we have held that it did not abuse its discretion in doing so. See infra Part IV. D. 3. Thus, we do not consider the evidence here. We are only evaluating Board actions regarding zone-jumping that were taken on or before the last day of trial. However, our holdings here are no bar to a future suit challenging Board actions regarding zone-jumping that were taken since the close of evidence at trial on August 23, 1989.
 
 
 [27]
 Likewise, it is not clear that the Board was purposely enduring the loss of $3000 per interdistrict transfer student as the price of pursuing its racist agenda; there is a reasonable inference that the Board was doing as much as it believed it could to retain the funds, and that any failure to take further measures was attributable to the Board's belief that such measures would be ineffective, rather than to racism
 
 
 [28]
 Of course, as discussed above, to show that a transferor school district has violated a court-ordered transfer provision like Talladega County's, it must be shown not only that transfers have increased the duality of either the transferor or the transferee school system, but also that the transferor school district "consented" to the transfers. See supra Part IV. A. 2. c. i
 
 
 [29]
 Since the Talladega City school system would not accept transfer students who could not produce their educational records from their former schools, see Defendants' Exhibit 13 at 2, refusal by the Board to transfer the educational records of students attempting to attend school out of zone would prevent those students from zone-jumping
 
 
 [30]
 The parties have stipulated that "[u]ntil July 1988, Talladega City and Sylacauga City were under federal court order not to allow inter-district transfers where the cumulative effect would be to undermine desegregation in their school district or in a surrounding school district." R1-83-10
 
 
 [31]
 We express no opinion on the issue of whether a state law or policy that purported to require transferring the records of a zone-jumping student would be preempted to the extent that it conflicted with the dictates of Title VI and its implementing regulations, since plaintiffs do not raise the argument
 
 
 [32]
 Plaintiffs also suggest that, until Talladega City was released from court supervision, the Board could have reduced the incidence of zone-jumping by asking the district court to enforce Talladega City's interdistrict transfer provision. See Plaintiffs' Brief on Appeal at 30. Whether or not the Board could at one time have reduced the zone-jumping problem by taking such action, it could no longer do so at the time of trial, nor can it do so now, since the City system was released from district court supervision in July 1988. The only relief plaintiffs request against the County on their zone-jumping claim is that the County be ordered to implement any measures that are within its power to stop zone-jumping. Thus, even a showing that the Board's failure to intervene in the City's litigation contributed at one time to the disparate impact identified would not entitle plaintiffs to the relief they request, since intervention in now-dismissed litigation is obviously not within the Board's power
 
 
 [33]
 Since plaintiffs have not made a prima facie showing that the Board's zone-jumping policy violated the Title VI regulations, the Board is entitled to prevail without having to demonstrate any substantial legitimate justification for its policy. See supra Part IV.A.1
 
 
 [34]
 Obviously, if neither the County Board's nor the City Board's actions alone had violated the equal protection clause, those actions combined could not have violated the clause either
 
 
 [35]
 Plaintiffs do argue in their reply brief on appeal that "[t]he combined actions of Talladega City and Talladega County Schools Districts have increased the racial isolation of the Training School." Plaintiffs' Reply Brief on Appeal at 20. To the extent that this statement constitutes an argument that the City Board and the County Board cooperated to violate the Title VI regulations, we ordinarily would not entertain the argument on appeal, since it was not raised below. Furthermore, if we did consider the argument, we would note that the contention was not supported by the evidence, for both City and County school officials testified that there was no agreement between the City and the County to allow white students zoned for the Training School to attend City schools. See R3-134 (Testimony of Talladega School Superintendent Billy Mills); R4-474 (Testimony of Talladega County Board of Education Chairman Lawrence Morris)
 
 
 [36]
 Plaintiffs' counsel stated at oral argument that the student body at the Stemley Bridge Road school is currently 75% black and 25% white
 
 
 [37]
 In addition to the three factors already identified, plaintiffs also point to the timing of the Board's decision to close Hannah Mallory as evidence of discriminatory intent. They note the district court's finding that the Board had decided to close Hannah Mallory before the March 13, 1985 order dismissing Lee v. Macon County with respect to Talladega County. They also note that the formal Board resolution to close the school was not made until after the dismissal, and that apparently neither the court nor the private plaintiffs were informed of the closure plans before plaintiffs consented to dismissal and the court approved dismissal. To the extent that the closure decision "was made informally and not disclosed prior to the court's approval of the Stipulation of Dismissal in 1985, it would be highly probative on the issue of discriminatory intent," plaintiffs argue. Plaintiffs' Brief on Appeal at 14. We have not considered the extent to which this evidence is probative of the motivation for closing the school, since from considering the briefs as a whole it is clear that plaintiffs do not challenge the closing of Hannah Mallory. However, along with the other three factors, we have considered the timing of the closure resolution as part of the overall evidence of intent to discriminate in making those decisions plaintiffs do challenge
 
 
 [38]
 We note that the Stemley Bridge Road school is now operating successfully in an integrated setting, with a 75% black and 25% white student body. We also note that renovations at the Training School have been completed. Under these changed circumstances, plaintiffs might be able to prove that white students who have been avoiding the Training School through zone-jumping would now attend the school. Thus, plaintiffs might now have a stronger case on causation with respect to any future acts of the Board